(July 21, 2005)

■ ANN STYLES et al., Respondents-Appellants, v GENERAL MOTORS CORPORATION, Appellant-Respondent, and PHILIP WIENER et al., Respondents, et al., Defendant. [799 NYS2d 38]—

Appeal from judgment, Supreme Court, New York County (Donna Mills, J.), entered October 1, 2002, after a jury trial, in favor of plaintiffs in the amount of $5,206,553, held in abeyance, and the matter remanded for a *Frye* hearing.

Plaintiffs' decedent sustained fatal injuries when the Chevrolet Suburban SUV in which he was a passenger overturned after being hit by another vehicle. The parties agreed that plaintiffs were without fault in the accident, which happened when the Wiener defendants' vehicle suddenly crossed a median divider and struck plaintiffs' SUV head-on, causing it to spin counterclockwise, slide on its side and roll over, eventually coming to rest on its roof, which collapsed on the front passenger's side. Sharp factual disagreements about the SUV's crashworthiness were submitted for the jury's determination including how many times plaintiffs' vehicle rolled over, how much force was applied to the front passenger roof area, and whether any automobile manufacturer could adequately protect a passenger from the force to which the roof was subjected.

Plaintiffs' experts conducted a test, composed of two phases, on a single vehicle that was akin to plaintiffs'. First, the windshield was removed and the vehicle was gradually lowered, upside down, at a pitch angle of 16 degrees and a roll angle of 36 degrees onto the junction of the "A pillar" and the roof; after two minutes, when the weight on the junction reached 4,424 pounds, the roof crushed eight inches. Next, the vehicle was lifted and dropped on its roof, at a pitch angle of 0 degrees and a roll angle of 36 degrees, from a height of six inches.

According to plaintiffs' experts, the first part of the test is substantially similar to the generally accepted Federal Motor Vehicle Safety Standard (FMVSS) 216, promulgated by the National Highway Traffic Safety Administration, pursuant to which a plate is pushed down on the junction of the A pillar and the roof, at a pitch angle of 5 degrees and a roll angle of 25 degrees, for two minutes until a maximum pressure of 1.5 times the vehicle's weight or 5,000 pounds is reached. Plaintiffs' experts presented evidence that the angle used in step one of their test is more indicative of the accident, at least under plaintiffs' theory of what occurred. The variations in the angles in the two tests, and the fact that in plaintiffs' experiment the vehicle was inverted and lowered, rather than pressed by a plate as in FMVSS 216, do not render plaintiffs' experiment a novel scientific test within the meaning of *Frye v United States* (293 F 1013 [DC Cir 1923]). Evidence of experiments is properly admissible so long as the proponent establishes a "substantial similarity between the conditions under which the experiments were conducted and the conditions at the time of the event in question" (*People v Laufer*, 275 AD2d 655, 655 [2000], *lv denied* 96 NY2d 785 [2001]), particularly where the opponent has an unrestricted opportunity to cross-examine (*see Uss v Town of Oyster Bay*, 37 NY2d 639, 641 [1975]). Indeed, plaintiffs presented evidence that, at least in the 1980s, defendant General Motors conducted FMVSS 216-type tests at greater angles than specified in that standard and with the windshield removed.

With respect to the second phase of plaintiffs' experiment, it is uncontroverted that "drop testing" of vehicles to determine the crashworthiness of roofs is a routine, widely accepted scientific technique. Internal documents of General Motors indicate that the company had contemplated, if not actually conducted, drop tests from a height of 5½ feet, at a pitch angle of 0 degrees and a roll angle of 45 degrees, which is substantially similar to plaintiffs' test. Plaintiffs' experts explained the reasons for the particular angles and height selected for their experiment, and defendants conducted a thorough cross-examination and presented their own experts.

Although each phase of plaintiffs' test is, separately viewed, a widely accepted technique, plaintiffs failed to demonstrate that the use of both tests, *in combination, on the same vehicle*, has gained general acceptance within the pertinent scientific community. It is self-evident that an automobile subjected to two roof-stress tests is more likely to suffer a collapsed roof than a vehicle that undergoes only one such test. Moreover, plaintiffs' experts did not use the two parts of their test because they did not believe either of the tests alone would exert enough force on the roof; if those experts had, they presumably could have simply increased the pressure or the height of the drop. Rather, plaintiffs' experts indicated that the two components of their experiment were necessary to reflect different forces and factors of the accident. Translating a roll-over accident into angles of pitch and roll, and dropping and pressurizing, entails scientific matters not within the knowledge of the ordinary juror, and therefore must be demonstrated to be sufficiently established to have gained general acceptance within the scientific community.

Where, as here, the trial court admits expert testimony without conducting a preliminary inquiry into the reliability of the procedures utilized by the experts, the proper course is to hold the appeal in abeyance while the matter is remanded for a posttrial *Frye* hearing (*see People v Roraback*, 242 AD2d 400, 406 [1997], *lv denied* 91 NY2d 879 [1997]). At such a hearing, plaintiffs' experts would need to establish, inter alia, the general acceptance of their combination of the tests discussed, *supra*, and substantiate how the precise measurements of angle, weight, height, time, and other components were taken. Plaintiffs' experts would be limited to discussing the experiment they presented at trial, and would be precluded from offering any new or supplemental tests. Concur—Buckley, P.J., Mazzarelli and Gonzalez, JJ.

Friedman and Catterson, JJ., concur in a separate memorandum by Catterson, J., as follows: Although I join with the majority in remanding the matter for a posttrial *Frye* hearing, I write separately in order to point out that the record supports going further, and ordering a new trial as to liability. As set forth below, it is clear from the existing record that the testimony and proof of the plaintiffs' experts was deficient.

Plaintiff's decedent sustained fatal injuries when the Chevrolet Suburban sport utility vehicle in which he was a passenger overturned after being hit by another vehicle. The jury returned a liability verdict against General Motors, the Suburban's designer and manufacturer, finding that the Suburban had a defective roof structure and that such defect was a substantial factor in enhancing the decedent's injuries and causing his death.

The trial court permitted plaintiffs' expert Dr. Nash to testify concerning an experiment on a similar vehicle that allegedly demonstrated the Suburban's defective roof structure. In that experiment, the test vehicle was lifted in the air and then lowered so that the entire weight of the vehicle was resting on one small area of the roof at the right front corner adjacent to the windshield. The vehicle was suspended in that position until the roof eventually deformed. The vehicle was lifted again and then dropped on the deformed roof, causing the roof to collapse.

The results of a test intended to show the nature or tendency of an object are only admissible at trial if the test was conducted under conditions "sufficiently similar to the ones at issue to make the results achieved relevant." (*Cramer v Kuhns*, 213 AD2d 131, 138 [3d Dept 1995], *lv dismissed* 87 NY2d 860 [1995].) While the test conditions need not be identical, there must be sufficient similarity to permit the inference that the results of the experiment shed light on what occurred in the accident. Where plaintiff fails to make the necessary showing of similarity, the experimental evidence must be excluded. (*People v Cohen*, 50 NY2d 908, 910 [1980]; *see also Weinstein v Daman*, 132 AD2d 547, 548-549 [2d Dept 1987], *lv dismissed* 70 NY2d 951 [1988].)

It is uncontroverted that the test performed by plaintiffs' experts was not conducted under conditions "sufficiently similar" to that of the accident in question. Indeed, under cross-examination, plaintiffs' expert testified that the test conditions only represented the crash "in a general way." Additionally, the time frame of the test as well as the altitude at which the test vehicle was suspended did not match the uncontested details of the accident in any way whatsoever.

There is an additional reason that evidence heard on the Nash experiment should not have been admitted. It is well settled in New York that scientific opinion evidence will only be admitted at trial if the procedure and results are generally accepted as reliable in the scientific community. (*People v Wernick*, 89 NY2d 111, 115-116 [1996]; *People v Wesley*, 83 NY2d 417, 423 n 2 [1994]; *People v Hughes*, 59 NY2d 523, 537 [1983]; *see also Frye v United States*, 293 F 1013 [DC Cir 1923]; *Selig v Pfizer, Inc.*, 290 AD2d 319 [2002], *lv denied* 98 NY2d 603 [2002].)

This "general acceptance" or "*Frye* test" applies to all areas of scientific analysis including engineering. (*Clemente v Blumenberg*, 183 Misc 2d 923 [Sup Ct, Richmond County 1999].) It puts upon the proponent of scientific evidence the "burden of establishing the general scientific acceptance of the expert's theories." (*People v Kanani*, 272 AD2d 186, 187 [2000], *lv denied*

95 NY2d [2000]; *People v Fortin*, 289 AD2d 590, 591 [2d Dept 2001].) The *Frye* "general acceptance" test is intended to "protect[ ] juries from being misled by expert opinions that may be couched in formidable scientific terminology but that are based on fanciful theories." (*People v Weinstein*, 156 Misc 2d 34, 37 [Sup Ct, NY County 1992], citing Note, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 Stan L Rev 465, 497 [1990].) An expert's inability to show that his or her proffered theories have achieved general acceptance requires that his or her testimony be excluded. (*See People v Burton*, 153 Misc 2d 681, 683, 687, 690-691 [Sup Ct, Bronx County 1992].) This is in keeping with the "inherent power of all trial court Judges to keep unreliable evidence ('junk science') away from the trier of fact regardless of the qualifications of the expert. A well-credentialed expert does not make invalid science valid merely by espousing an opinion." (*Clemente v Blumenberg*, 183 Misc 2d at 932.)

In order to satisfy the *Frye* test, proponents of opinion testimony must show that the theories propounded by their experts were based on tests, procedures or methodology which have been "sufficiently established to have gained general acceptance in the particular field in which it belongs." (*People v Wesley*, 83 NY2d at 423, quoting *Frye v United States*, 293 F at 1014 [emphasis omitted].) While this does not mean that the methodology used must be "unanimously indorsed by the scientific community[, it must be shown to] be generally acceptable as reliable." (*Id.*, quoting *People v Middleton*, 54 NY2d 42, 49 [1981] [internal quotation marks omitted].)

The trial court failed to address this issue at all. Plaintiffs' experts conceded that the test described above has never been used to assess the structural strength of a vehicle. There was no recognized protocol for the test and no body of scientific or engineering data to verify the results of the test and the conclusions drawn therefrom. Plaintiffs' experts could not show that the Nash experiment had gained general acceptance, and evidence of the experiment and its purported results should not have been admitted in evidence. (*Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106, 106 [2003] [court properly struck expert testimony where plaintiff "failed to meet his burden of proof at the *Frye* hearing held during trial, that his expert's theory is generally accepted in the medical community" (citation omitted)]; *see Selig v Pfizer, Inc.*, 290 AD2d 319 [2002] [same]; *see also People v Wesley*, 83 NY2d at 422 ["(i)t should be emphasized that the inquiry here is into the reliability of the DNA evidence *at the time of the proceedings in this case*" (emphasis added)].)