(July 18, 2007)

JEAN DIEJOIA, Appellant, v GERALD M. GACIOCH, M.D., et al., Respondents. [839 NYS2d 904]—

Appeal from an order of the Supreme Court, Monroe County (Matthew A. Rosenbaum, J.), entered June 16, 2006 in a medical malpractice action. The order granted defendants' motions to dismiss the complaint pursuant to CPLR 4401.

It is hereby ordered that the order so appealed from be and the same hereby is unanimously reversed on the law without costs, the motions are denied, the complaint is reinstated and a new trial is granted.

Memorandum: Plaintiff commenced this medical malpractice action alleging, inter alia, that the manner in which defendant Gerald M. Gacioch, M.D. performed a cardiac catheterization on plaintiff was improper and caused an acute spinal cord infarct four days later, leaving plaintiff paralyzed and incontinent. Supreme Court granted defendants' motions to dismiss the complaint on the ground that plaintiff presented no competent

medical testimony on the issue of causation, and plaintiff appeals. We reverse.

We conclude that the court erred in agreeing with defendants following a *Frye* hearing that plaintiff's expert vascular surgeon (hereafter, expert surgeon) and plaintiff's treating vascular surgeon (hereafter, treating surgeon) were not permitted to testify on the issue of causation. Plaintiff's expert surgeon testified that the thrombosis that originated at the site of the catheterization in the groin occluded the entire right and left femoral arteries and also grew to occlude the distal aorta and the sacral spinal vessels, leaving only one vessel to support the whole spine and provoking the spinal stroke and ultimate paralysis. He further testified that it was well documented that a thrombosis of the distal aorta involving both right and left iliac vessels can result in spinal paralysis and that this was not a novel theory, and indeed had been described in the medical literature for 20 to 30 years. Plaintiff's expert surgeon conceded, however, that the medical literature that he reviewed does not specifically identify cases in which cardiac catheterization in the groin was the cause of the aortic thrombosis that led to an acute spinal cord infarct and paralysis. The court's ruling following the *Frye* hearing with respect to plaintiff's expert surgeon was based almost exclusively on the fact that he could not produce any medical literature indicating that cardiac catheterization has ever caused thrombosis and, subsequently, paralysis. In determining that plaintiff's expert surgeon would not be permitted to testify concerning causation, the court thus determined that his theory of causation was novel and not yet accepted in the medical field. Similarly, when the court required plaintiff's treating surgeon to explain his theory of causation during the *Frye* hearing, he also was unable to produce any medical literature that specifically supported his theory that cardiac catheterization could lead to delayed paralysis. At the close of plaintiff's case, the court granted defendants' motions to dismiss the complaint based on plaintiff's failure to present competent medical evidence with respect to causation.

We conclude that the court applied the *Frye* test too restrictively in refusing to allow plaintiff's expert surgeon and treating surgeon to testify with respect to the issue of causation. Plaintiff's expert surgeon testified that thrombotic events are well known to be associated with angiography and the cardiac catheterization process and that thrombosis of the distal aorta and both femoral arteries are known to have led to a spinal stroke. Similarly, plaintiff's treating surgeon testified concerning the science behind the formation of blood clots as the result

of catheterization and related it to the condition of plaintiff, whose aorta was "totally blocked" with clot and thrombus. Moreover, plaintiff's treating surgeon testified with respect to the mechanism of paralysis, explaining that a growing thrombus can keep blood flow from reaching the back wall of the spine, resulting in stroke and paralysis. He further testified that he has observed actual cases of delayed paralysis and that paralysis can occur up to 27 days after surgery.

As set forth in *Frye v United States* (293 F 1013, 1014 [1923]), "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." We conclude on the record before us that the theory of causation set forth by plaintiff's expert surgeon and treating surgeon is not premised on novel science but, rather, is premised on "generally accepted scientific principles and existing data" (*Zito v Zabarsky*, 28 AD3d 42, 45 [2006]). "*Frye* is not concerned with the reliability of a certain expert's conclusions, but instead with 'whether the expert[']s deductions are based on principles that are sufficiently established to have gained general acceptance as reliable' " (*Nonnon v City of New York*, 32 AD3d 91, 103 [2006], *affd* 9 NY3d 825 [2007]).

Here, while plaintiff's expert surgeon and treating surgeon concededly did not produce medical literature that documented a prior case study in which cardiac catheterization through the groin was the cause of the aortic thrombosis that led to an acute spinal cord infarct and paralysis, they each laid a foundation for their theories on causation with generally accepted medical principles of vascular medicine and blood supply that are not novel, nor are they even challenged herein. "[T]he underlying support for the theory of causation [need not] consist of cases or studies considering circumstances exactly parallel to those under consideration in the litigation. It is sufficient if a synthesis of various studies or cases reasonably permits the conclusion[s] reached by the plaintiff's expert[s]" (*Marsh v Smyth*, 12 AD3d 307, 312-313 [2004]). "The fact that there was no textual authority directly on point" with respect to the onset of the events that resulted in plaintiff's paralysis "is relevant only to the weight to be given the testimony, but does not preclude its admissibility" (*Zito*, 28 AD3d at 46). Moreover, "[u]nlike a newly developed test or process, a theory about the mechanism of an injury will not prompt the profession generally to weigh in with its own studies or publications on the

subject" (*Marsh*, 12 AD3d at 312). Because the conclusions of plaintiff's expert surgeon and treating surgeon were based on accepted scientific principles involving medicine and the vascular system and were not "based solely upon the expert[s'] own unsupported beliefs" (*id.*), the court erred in determining that their testimony with respect to causation was inadmissible based solely upon the fact that there was no medical literature linking a cardiac catheterization in the groin to an aortic thrombosis with a delayed spinal infarct and paralysis.

Finally, we conclude that the court properly refused to admit the proffered testimony of a third expert for plaintiff on the issue of negligence because that expert had not practiced medicine since 1987, approximately 16 years before plaintiff's surgery, and her opinion was based on her conversation with plaintiff's treating surgeon (*see generally Matott v Ward*, 48 NY2d 455, 459-462 [1979]). Present—Gorski, J.P., Martoche, Centra, Lunn and Green, JJ.