OPINION OF THE COURT
Joseph J. Maltese, J.
The plaintiff Lauren Melnick, who was pregnant, claims that as a result of her slip and fall on defendant’s manhole cover, she went into labor and delivered a premature baby girl. Plaintiffs claim that the premature birth and low birth weight was the proximate cause of her child’s autism spectrum disorder and pervasive developmental disorder that were diagnosed 14 months after birth. The defendant, Consolidated Edison, Inc. (Con Ed), moved for an order precluding plaintiffs’ expert from offering such an opinion to a jury because a preterm birth after 34.2 weeks of pregnancy and birth weight of five pounds, four ounces does not constitute a generally accepted cause of autism/ pervasive developmental disorder (PDD) in the medical community.
After a Frye hearing, this court has granted the defendant’s motion to preclude the causation opinion of the plaintiffs’ expert witness and has consequently dismissed the plaintiffs’ complaint.
Facts
The plaintiff Lauren Melnick, on January 3, 2009 at approximately 4:00 p.m., slipped and fell on a Con Ed utility “manhole” cover while she was in her 34th week of pregnancy. Plaintiffs claim that as a result of her “slip and fall” backwards onto her wrists and backside, she went into preterm labor that evening. The medical records disclose that Ms. Melnick arrived at Richmond University Medical Center (RUMC) on January 3, 2009 at 8:40 p.m. with complaints of vaginal bleeding for one hour and cramping for one month. She also reported that she had not felt the baby moving since the night prior to her slip and fall. She made no mention to any hospital or medical personnel that she “slipped and fell” earlier in the day. Indeed, Lauren Melnick testified at her deposition that she had not told her husband of her fall until January 13, 2009, after the baby had come home from the hospital, for fear that he would have been disappointed with her.
*802 Ms. Melnick was admitted to the RUMC labor and delivery section to monitor her labor and bleeding. Fetal monitoring confirmed that Ms. Melnick was in labor. Dexamethasone was offered for fetal lung maturity, but Ms. Melnick refused it. The next morning, on January 4, 2009 at 9:29 a.m., Ms. Melnick vaginally delivered the infant plaintiff, Jenny Fay Kusner, with no apparent complications. The infant plaintiff weighed 2,381 grams (five pounds, four ounces), and her Apgar scores were 9 at one minute and 9 at five minutes. (Exhibit 1: portions of labor & delivery records.)
Jenny was transferred to the Neonatal Intensive Care Unit (NICU), where she received oxygen via CPAP (continuous positive airway pressure). She also required ventilator assistance for three days for respiratory distress. She was diagnosed with feeding issues, and hyperbilirubinemia secondary to prematurity, which was treated. Blood gases were recorded daily and were within normal limits. The infant plaintiff was discharged on January 12, 2009, eight days after birth. During the admission, she was noted to be neurologically intact, with no evidence of hypoxic ischemic encephalopathy. (Exhibit 2: portions of the infant plaintiffs birth admission.)
On March 18, 2010 at 14 months of age, Jenny was not speaking and only communicated by crying. She was diagnosed with autism/PDD and was referred to early intervention. On April 29, 2010, at approximately 15 months of age, Ms. Melnick brought the infant plaintiff for a second opinion and evaluation that confirmed the diagnosis of autism/PDD. (Exhibit 3: early evaluation by Dr. Clemente from the infant plaintiffs early intervention records.)
Justice John A. Fusco presided over the liability phase of the trial concerning the plaintiff Lauren Melnick’s slip and fall on a manhole cover. The issue of whether Lauren Melnick’s slip and fall caused her to go into preterm labor was not decided by the jury in the liability trial. The jury found Con Ed was 75% negligent and the plaintiff 25% negligent. After the liability trial, the damages portion of the bifurcated trial was assigned to this court, which addressed the defendant’s motion for a formal Frye hearing.
The Hearing
Both counsel for the plaintiffs and defendant acknowledge that plaintiffs’ theory of general causation has not been ruled upon by any other court in this state or in the nation. The plaintiffs’ counsel argues that a Frye hearing is not required *803 because his expert relied on published studies concluding that prematurity and low birth weight accompanied by respiratory complications in a newborn can cause or contribute to developmental delays and that the theory is not new or novel. Therefore, he argues it is improper to preclude plaintiffs’ expert under Frye and its New York State progeny. To support his contention, the plaintiffs’ counsel cites to Parker v Mobil Oil Corp. (7 NY3d 434 [2006]), Ratner v McNeil-PPC, Inc. (91 AD3d 63 [2d Dept 2011]), and Lugo v New York City Health & Hosps. Corp. (89 AD3d 42 [2d Dept 2011]). Interestingly, the defendant’s counsel also cited to these same cases with different conclusions.
The New York Court of Appeals in Parker v Mobil Oil Corp. (7 NY3d 434 [2006]) distinguished Frye challenges of new or novel expert theories from other reliability challenges to the admissibility of expert opinions.
“The Frye inquiry is separate and distinct from the admissibility question applied to all evidence— whether there is a proper foundation — to determine whether the accepted methods were appropriately employed in a particular case (Wesley, 83 NY2d at 429). ‘The focus moves from the general reliability concerns of Frye to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial’ (Wesley, 83 NY2d at 429).” (Id. at 447.)
In Parker v Mobil Oil, the Court outlined that
“[p]rior to the completion of discovery, and before the exchange of expert reports, defendant Mobil Oil and several third-party defendants moved to preclude Parker’s expert testimony on the issue of medical causation. Defendants argued that the expert testimony was scientifically unreliable and should be excluded under Frye v United States (293 F 1013 [DC Cir 1923]). Further, defendants moved for summary judgment dismissing all claims, arguing that they lacked the necessary support in the absence of appropriate causation evidence.” (Id. at 442.)
Eric Parker, a gas station worker, sued Mobil Oil et al. alleging that exposure to benzene, an ingredient in gasoline, through inhalation of gasoline fumes and by physical contact with gasoline caused him to develop acute myelogenous leukemia (AML). Both the trial court and the Court of Appeals acknowledged *804 that “[t]here is no dispute that benzene is a known carcinogen.” (Id.) Hence, there was no need to establish general causation that benzene can cause AML. Therefore, neither of the parties requested a formal Frye hearing, nor was one conducted by the trial court. However, the defendants’ challenge centered on the reliability of plaintiffs expert’s methodology and procedures to establish “specific causation,” that is, whether there was reliable evidence to demonstrate that the plaintiff was exposed to a sufficient amount of benzene to cause his AML.
In Parker, the Court of Appeals clarified the role of the trial court in assessing the challenge to an expert’s opinion:
“Here, there is a question as to whether the methodologies employed by Parker’s experts lead to a reliable result — specifically, whether they provided a reliable causation opinion without using a dose-response relationship and without quantifying Parker’s exposure. There is no particular novel methodology at issue for which the Court needs to determine whether there is general acceptance. Thus, the inquiry here is more akin to whether there is an appropriate foundation for the experts’ opinions, rather than whether the opinions are admissible under Frye.
“As with any other type of expert evidence, we recognize the danger in allowing unreliable or speculative information (or ‘junk science’) to go before the jury with the weight of an impressively credentialed expert behind it.” (Id. at 447.)
The Court of Appeals upheld the preclusion of the plaintiffs experts.
The New York Supreme Court, Appellate Division, Second Department in Ratner v McNeil-PPC, Inc. (91 AD3d 63 [2011]) discussed the dichotomy between studies that demonstrate an association and those that establish medical or legal causation. In Ratner, the Court held that the trial judge properly precluded plaintiffs expert witness testimony as to a causal connection between her therapeutic use of acetaminophen (Tylenol) and the subsequent development of liver cirrhosis where the expert’s theory of causation was based mainly by extrapolation from a few observational case studies. Justice Jonathan Leventhal writing for the unanimous Appellate Division panel recognized that “[djeduction, extrapolation, drawing inferences from existing data, and analysis are not novel methodologies and are accepted stages of the scientific process.” (Id. at 74.) But nevertheless, he *805 went on to add: “[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered” (id. at 75, quoting General Electric Co. v Joiner, 522 US 136, 146 [1997]).
The Second Department also cited to Blackwell v Wyeth (408 Md 575, 971 A2d 235 [2009]), from the Court of Appeals of Maryland, its highest court, which affirmed the trial court’s preclusion of plaintiffs’ expert after a Frye hearing to determine whether thimerosal, an ethyl mercury preservative placed into the measles, mumps and rubella vaccine, caused autism in children. The basis of that decision was that the method of analysis and extrapolation of the existing data was not a generally accepted method that was reliable in the scientific community. The court concluded that the opinion of the expert was mere conjecture and was not reliable.
In the absence of a showing that a “reasonable quantum of legitimate support exists in the literature for the expert’s views,” the opinion must be precluded. (Lugo v New York City Health & Hosps. Corp., 89 AD3d 42, 62 [2d Dept 2011], citing Marsh v Smyth, 12 AD3d 307, 312 [2004, Saxe, J. concurring].)
In Cumberbatch v Blanchette (35 AD3d 341 [2d Dept 2006]), the plaintiffs’ expert could cite to no relevant scientific data or studies to support his causation theory that fetal distress resulting from the compression of the infant plaintiffs head due to labor contractions, augmented by pitocin, resulted in ischemia, which, in turn, resulted in an infarction, and he could cite to no instance when this type of injury had previously occurred in that manner. The Second Department concluded that the opinion of the plaintiffs’ expert was scientifically unreliable.
Whether expert testimony is novel or not, a trial court always has the duty to rule on the admissibility of evidence to determine its reliability and relevance.
Plaintiffs’ Expert Witness
The plaintiffs’ expert, Dr. Allan Rubenstein, a board certified neurologist, maintains a private medical office at New York University Langone Medical Center where he is also a professor of neurology and pediatrics. He is not board certified in pediatrics and his neurology board certification is in adult neurology. Dr. Rubenstein has been involved in developing therapies for a variety of genetically determined disorders and has been involved in several biotechnology companies. His independent research has been in seeking a potential treatment for *806 fragile X syndrome, which is a genetic condition involving changes in part of the X chromosome that is a common form of inherited intellectual disability, which generally occurs in boys. Dr. Rubenstein does not regularly testify in medical legal proceedings, but was precluded from testifying before a jury by Justice Greene in Bronx County Supreme Court.
Dr. Rubenstein examined Jenny Kusner initially on June 21, 2010, when she was 17 months old, and again on September 7, 2012, when she was three years and eight months old. Dr. Rubenstein wrote a report as to each visit that was appended along with his curriculum vitae to the plaintiffs’ CPLR 3101 (d) (1) notice of expert witness, which was received in evidence for this hearing (exhibit 4). In his 2012 report, Dr. Rubenstein cited only two studies to support his opinion: Naya Juul-Dam et al., Prenatal, Perinatal, and Neonatal Factors in Autism, Pervasive Developmental Disorder-Not Otherwise Specified, and the General Population (107 Pediatrics [No. 4] e63 [Apr. 1, 2001]) (exhibit 5); and Catherine Limperopoulos et al., Positive Screening for Autism in Ex-preterm Infants: Prevalence and Risk Factors (121 Pediatrics [No. 4] 758 [Apr. 1, 2008]) (exhibit 6). Dr. Ruben-stein concludes his report by stating “while Jenny Fay was low birth weight, but not very low birth weight, in view of her history and lack of evidence for other genetic, metabolic or structural disorder of the brain, her ASD is in my opinion causally related to her prematurity.”
Dr. Rubenstein testified that when he performed his initial examination, he had reviewed the record and report of Dr. Clemente as part of the early intervention process. He disclosed that Dr. Clemente’s diagnosis was that Jenny had pervasive developmental disorder and autism spectrum disorder. Dr. Rubenstein believed that Jenny had been diagnosed with global developmental delay, which he characterized as multifactorial in causation, and which causes developmental delay of a variety of degrees of severity across various forms of cognitive functioning (tr at 19). He further stated that global developmental delay is grossly related to and substantially overlaps with autism spectrum disorder, and that all of them are clinical syndromes, but are not specific diagnoses and are not necessarily specifically uniform as causation diagnoses (tr at 20). At the initial June 2010 evaluation, Dr. Rubenstein thought Jenny had significant developmental delay and had impaired social communication consistent with autism spectrum disorder.
Dr. Rubenstein testified that Jenny had both pervasive developmental disorder and autism. He defined them as follows: *807 “Pervasive developmental delays implies cognitive dysfunction across all aspects of functioning including language but also other higher mental functions. Autism specifically refers to communication issues and children with autism can have otherwise normal IQ. They can have an IQ which is either below or above normal” (tr at 22).
Dr. Rubenstein further stated that genetic screening was conducted on the mother, Lauren Melnick, to include Ashkenazi Jewish genetic diseases, fragile X screening and cystic fibrosis screening which were negative (tr at 23).
When confronted with the fact that the mother took antidepression or antianxiety medicine within the first few weeks of her pregnancy, Dr. Rubenstein did not find any significance to that fact and was not aware of any specific link in any case to any neurodevelopment outcome for those specific medications. But he did acknowledge that taking multiple drugs such as cocaine may be a serious issue (tr at 24-25). He noted that Jenny did not exhibit dysmorphism, which he characterized as an abnormality, often in the face, which may be a symptom of genetic disease (tr at 26).
The court asked whether developmental delays necessarily fall under autism spectrum disorder; Dr. Rubenstein testified that they did not. He testified that “autism spectrum disorder refers specifically to language and social communication problems, which are thought to have specific sets of neurophysiologic underpinnings, which may or may not be present in other forms of cognitive dysfunction such as current and global developmental delay” (tr at 26). He continued that a child’s delay in speaking is a developmental delay, but that lack of speech, coupled with lack of “social communication, interaction, eye contact, response to emotional stimuli and a variety of other things, which are not necessarily verbal, but are part of language and social development” (tr at 27).
Plaintiffs’ counsel sought Dr. Rubenstein’s opinion with regards to causation of Jenny’s delays and whether he attempted to rule out certain factors; Dr. Rubenstein responded:
“Yes, that’s what a clinician does in arriving at a diagnosis or should do and review all the possible etiologies and come up with what is most likely to be the etiology.
“Now, having said etiology, I will make it clear, nobody knows exactly what the actual mechanism for development of the communication actual *808 circuitry issues are. Whether it’s genetic or environmental or due to low birth weight. Nobody knows exactly what the actual mechanism linking those are. But I think it’s clear that there are a number of genetic disorders, many of which I had long standing interest in, which are associated frequently with autism.
“There have been, unfortunately, exposures to elicit drugs, cocaine, and other things which are associated with increased incidents of autism. There have been several large studies which, to my mind, in my opinion, link low birth weight to increased association with autism. And I am trying to make a point that nobody knows exactly what the cause of the actual mechanism is” (tr at 28-29).
When questioned about the fact that Lauren Melnick advised her attending physician that she had relatives on her mother’s side of the family (two second cousins) and the child’s father’s side of the family (two first cousins) that had autism, Dr. Ruben-stein testified that it was not particularly relevant in that they were not immediate first degree relatives, which he defined as mother, father, sister, brother (tr at 32-33). He further asserted that genetically determined cases of autism are sporadic mutations and do not involve disorders in which there is a family history (tr at 33).
When asked whether he was familiar with the journal articles presented by plaintiffs’ counsel, Dr. Rubenstein responded that he had read them. It was apparent that Dr. Rubenstein did not research the articles presented by counsel to form the basis of his opinions. These additional articles were supplied by counsel and he was asked to comment or adopt them in testifying at the hearing. When Dr. Rubenstein was presented with a copy of the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM IV-TR), published by the American Psychiatric Association (2000), he recognized it as an authoritative source. After reviewing the section on autistic disorders (international diagnostic codes [ICD-9-CM] 299.00-299.80), he acknowledged that prematurity was not listed as a cause, nor was there any discussion of causation in the DSM IV-TR (tr at 36-38).
Plaintiffs’ counsel presented Dr. Rubenstein with a 2011 study contained in the journal Pediatrics by Jennifer Pinto-Martin et al. entitled Prevalence of Autism Spectrum Disorder in Adolescents Born Weighing <2000 Grams, which was not noted in his *809 September 7, 2012 report appended to the CPLR 3101 (d) (1) notice of expert witness. He also mentioned the 2008 Swedish study, which he did cite in his report, that discussed an increased risk of autism disorder related to preterm births, which were born weighing less than 1,500 grams. Dr. Rubenstein acknowledged that neither of those studies was identical to the birth weight of Jenny, which was 2,381 grams (five pounds, four ounces), but claimed that there could be a wider applicability to those studies (tr at 43-44).
On cross-examination Dr. Rubenstein claimed his expertise was in neurogenetics, to include neurofibromatosis disorders. He acknowledged that according to the Centers for Disease Control and Prevention (CDC) at least one in 88 children are diagnosed with autism and that one in 52 are boys and one in 252 are girls (tr at 51).
Dr. Rubenstein asserted that low birth weight was statistically associated with the presence of autism. When pressed about his opinion as to the cause of autism, he stated:
“Well, if you are talking about if you are talking about cause implies knowledge of a specific mechanism. There is no known, to my knowledge, specific mechanism for cause of any of the autism spectrum disorders.
“So, the answer to that, nobody knows what causes autism. There are a number of factors which have been statistically linked to an increased incident of autism” (tr at 50).
Dr. Rubenstein stated that prematurity and birth weight are linked statistically, but noted they are not synonymous and that the journal articles that he was presented with by the plaintiffs’ counsel focused on birth weight. He also acknowledged the concept of “small for gestational age” (tr at 52). After being pressed by defense counsel he acknowledged that Jenny was 2,381 grams and was born at 34.2 weeks, which was between the 50th-75th percentile for her gestational age (tr at 54-55). A review of the chart demonstrates that Jenny was not small for her gestational age, but was quite normal. As to the 2011 study which addressed children born weighing less than 2,000 grams, the children in that study ranged in weight from 500 to 2,000 grams with a median weight of 1,250 grams, which is approximately half of Jenny’s birth weight of 2,381 grams.
The records of Dr. Heckman, a geneticist, show that the mother, Lauren Melnick, took Effexor from June 14 to June 18, *810 2008, when the gestational age of the baby was about six weeks. She also acknowledged having taken Xanax (alprazolam), a benzodiazepine, early in her pregnancy. Dr. Rubenstein claimed that he was not aware of any publications discussing a link in the use of antidepressants and autism. However, the defendant’s counsel confronted Dr. Rubenstein with a 2011 journal study entitled Antidepressant Use During Pregnancy and Childhood Autism Spectrum Disorders (Lisa A. Croen, 68 Archives of Gen Psychiatry [No. 11] [2011] [exhibit 24]), which concluded that prenatal exposure to selective serotonin reuptake inhibitors, such as Effexor, specifically during the first trimester may moderately increase the risk of ASD (autism spectrum disorder). In response, he acknowledged the warnings about this, but did not know anything about such results.
When asked if he knew Dr. Alan Guttmacher, the Harvard educated director of child health and human development at the National Institute of Health, who is a renowned pediatrician and a medical geneticist, Dr. Rubenstein responded that he is a well-regarded physician. Dr. Guttmacher recently testified at a congressional hearing on “Autism-Related Issues” on November 22, 2012, the minutes of which were appended as exhibit 26. Dr. Rubenstein stated he had not read the minutes of Dr. Alan Guttmacher’s report, which was submitted into evidence. However, when asked whether he agreed with Dr. Guttmacher’s conclusion when he stated, “we do not know the cause of ASD, but very recent findings comparing identical and fraternal twins suggest the importance of focusing on both environmental and genetic factors,” Dr. Rubenstein responded that he agreed with that conclusion (tr at 79).
Dr. Rubenstein defined prematurity as less than 36 weeks of gestational age and defined'low birth weight as less than 2,500 grams. Dr. Rubenstein admitted that he had not read all of the studies presented to this court (tr at 58). Moreover, he acknowledged that the term “causation” as opposed to “association” is a stronger conclusion (tr at 61).
Defendant’s Expert Witness
Dr. David Kaufman, who was the defendant’s expert witness at the hearing, graduated from Boston University School of Medicine in 1975 and completed his internship and residency in pediatrics at New York Hospital of Cornell University Medical Center in 1977. Dr. Kaufman completed a fellowship and training in pediatric neurology at Mt. Sinai Medical Center in 1980 and has been in private practice since 1980. He is board certi *811 fied in pediatrics, but did not pass the boards in neurology. He admitted that he overwhelmingly testifies for defendants in medical legal matters.
In 1997 Dr. Kaufman joined an agency called YAI/National Institute for People with Disabilities as its medical director. He also works in the Center for Attention and Learning Disorders at Lenox Hill Hospital in concert with a psychologist and a learning specialist to conduct comprehensive evaluations of persons with learning disorders and autism. He has diagnosed several hundred persons with autism/PDD (tr at 91-92). He testified that very, very few of the children he has diagnosed had a history of prematurity and low birth weight (tr at 92).
Dr. Kaufman examined Jenny Kusner on behalf of the defendant on two occasions and wrote reports on each visit that are appended to the defendant’s CPLR 3101 (d) (1) notice of expert witness, which has been received in evidence. His second examination of Jenny was on November 6, 2012 when she was three years and 10 months old. At that time he commented about the extensive early intervention and applied behavioral analysis to treat her communication skills and eye contact, and other occupational therapies that she was undergoing since his first examination. He noted she had no medical problems and was not on any medications and had no allergies (tr at 95).
He stated that while she was shy, he engaged her with puzzle pieces of animals, which she correctly identified by the noises they made. Notwithstanding the mother’s comment that she did not hold a pencil correctly, she wrote her name and was able to draw a cross, a circle and a square. She followed commands to jump, twirl, walked on her heels and toes and clapped when asked to do so. She gave Dr. Kaufman a hug and kissed his hand when she left. He stated that she had a normal neurological exam for a three year old.
He asserts that she has made excellent progress since his first examination in March of 2011. He commented that her speech was more fluent and she was very active. He concluded that she is probably on the very mild end of autism/PDD spectrum with no other evidence of developmental delay and a good prognosis for the future (tr at 96). Jenny has no dysmorphic features, which Dr. Kaufman characterized as funny looking faces or mild conditions in the hands. He clarified that not all underlying genetic conditions result in dysmorphic features (tr at 97).
Dr. Kaufman defined the term “association” as a medical term of art, such as left-handed people have a higher incidence *812 of learning disabilities, but that is just an association made over time, but is not a “causative thing.” But he did acknowledge that an association can also be a cause, but not usually (tr at 98-99).
Dr. Kaufman asserted that low birth weight and prematurity in a child are not generally accepted causes of autism within the medical community (tr at 99). As to the journal articles presented by the plaintiffs’ attorney which he received, Dr. Kaufman highlighted that none of those studies spoke to a cause and effect relationship. The fact that premature babies at less than 29 or 28 weeks of gestational age who weighed less than 1,000 grams are clearly at risk of developmental issues, cerebral palsy, cognitive delays and seizures does not mean that all of them are going to develop those conditions (tr at 100).
Dr. Kaufman stated that his examination of Jenny disclosed that she has progressed with her intensive therapies and that she has normal intelligence. He predicted that by five, six or seven years of age she should be able to go into a mainstream school situation and do fine, assuming she continues to progress as she has (tr at 101).
On cross-examination, Dr. Kaufman acknowledged that Jenny had respiratory problems when she was born at 34.2 weeks of gestation and that she received CPAP. But he disclosed that the lungs tend to develop between 34-37 weeks of gestation and that her lungs were a little immature and that frequently the mother is offered a steroid called dexamethasone, which helps lung development. The record shows that Ms. Melnick was offered dexamethasone, but refused it. Nonetheless, Dr. Kaufman concluded that the lung therapy was only administered for a few days (tr at 111).
He did acknowledge that he did not initially ascertain that the child was diagnosed and treated for hyperbilirubinemia in the NICU (tr at 111). He agreed that there was an association between prematurity and immature lung development. He also agreed with the 2011 study from the journal Pediatrics concluding that there is an association between low birth weight and autism, but he concluded “this child did not have very low birth weight” (tr at 114). He responded to plaintiffs’ counsel that very low birth weight is usually under 1,500 grams. After reviewing the IQ tests of Jenny at two years, 10 months, Dr. Kaufman disclosed that they were normal (tr at 122).
Defendant argues that plaintiffs’ reliance on the journal articles cited by Dr. Rubenstein is misguided. There is no sup *813 port in the medical literature or evidence in this case to support plaintiffs’ causation theory.
Discussion
Courts are not medical or scientific laboratories in which to experiment with novel theories of causative factors of disease or medical conditions. An association in medicine or science is different from causation. Causation may be easier to prove where a person slips and falls upon a utility manhole cover and thereby lands upon their backside resulting in an injury to their vertebra. But here the plaintiff mother sustained no personal injury. Instead, she attempts to prove that her slip and fall caused her to undergo early labor and delivery of a premature, low birth weight (five pounds, four ounces) baby girl with respiratory and other complications, which proximately caused her child’s autism/PDD, diagnosed 14 months after birth. Here, the plaintiffs’ chain of causation is more protracted and remote requiring medical proof that is generally accepted within the medical community. (Frye v United States, 293 F 1013 [1923].)
Plaintiffs attempt to prove causation by demonstrating studies that show an association rather than a cause of autism.
Association v. Causation
In medicine the term “association” is defined as:
“1. A connection of persons, things, or ideas by some common factor.
“2. A functional connection of two ideas, events, or psychological phenomena established through learning or experience.
“3. Statistical dependence between two or more events, characteristics, or other variables.
“4. In medical genetics, grouping of congenital anomalies found together more frequently than otherwise expected; the use of this term implies that the cause is unknown” (PDR Medical Dictionary 157 [2d ed 2000] [emphasis added]).
In medicine the term “cause” is defined as “that which produces an effect or condition; that by which a morbid change or disease, and epidemiology, are largely concerned with causality.” “Proximate cause” is defined “as the immediate cause that precipitates a condition,” while “specific cause” is defined as “a cause, the action of which can definitely produce the condition in question” (PDR Medical Dictionary 304 [2d ed 2000]).
In law the term “proximate cause” is defined as “(1) a cause that is legally sufficient to result in liability; (2) a cause that *814 directly produces an event and without which the event would not have occurred” (Black’s Law Dictionary 213 [7th ed 1999]). There is no corresponding reference to the word “association” in the law, which refers to gathering mental ideas or people for a common purpose or an unincorporated business (Black’s Law Dictionary 119 [7th ed 1999]).
New York courts permit expert testimony based on scientific principles, procedures, or theories only after the principles, procedures, or theories have gained general acceptance in the relevant scientific field. (People v Wesley, 83 NY2d 417, 423 [1994]; see also Frye v United States, 293 F 1013 [DC Cir 1923].) The Frye “general acceptance” test is intended to “protect juries from being misled by expert opinions that may be couched in formidable scientific terminology but that are based on fanciful theories.” (People v Weinstein, 165 Misc 2d 34, 37 [1992].) It helps courts avoid reliance on theories which may actually be widely rejected as baseless, unreliable or insufficiently established. (Marsh v Smyth, 12 AD3d 307 [1st Dept 2004].)
This court has previously ruled that “[a] well-credentialed expert does not make invalid science valid merely by espousing an opinion.” (Clemente v Blumenberg, 183 Misc 2d 923, 932 [Sup Ct, Richmond County 1999].) An expert cannot manufacture “general acceptance” in a court case. General acceptance comes from the experts in the field, that agree with the procedures and methods used along with the data they produce that are published in studies and journal articles that are subject to peer review in viewing a new theory or principle. General acceptance does not come from the number of jurors that can be convinced of a novel theory at a trial, especially where there is scant evidence to support that new theory or principle.
While it is undisputed that the infant plaintiff, Jenny Fay Kusner, has had developmental delays, the witnesses only disagree as to the extent of her condition and her future prognosis. Plaintiffs’ expert, Dr. Allan Rubenstein, maintains that Jenny has global developmental delays, while Dr. Kaufman, the defendant’s expert, claims that her disabilities are mild and treatable. The child’s records show that she has a normal IQ and Dr. Kaufman asserts that by age five, six or seven she should be mainstreamed in school. Dr. Kaufman does not causally relate Ms. Melnick’s slip and fall with her early labor and premature birth to Jenny’s condition. Both Dr. Rubenstein and Dr. Kaufman agree that Jenny, who is now barely four years old, has improved markedly since her initial diagnosis and their examinations of her due to her extensive early intervention treatments.
*815 Dr. Kaufman explained that autism is a developmental disorder that is characterized by impairment in social interaction and communication, and by the presence of stereotypic behavior. Symptoms are often noticed by 12 months of age and affected people show large individual differences in their symptomatology. Autism is part of a spectrum of disorders that includes Asperger syndrome and FDD. Symptoms may include problems with using and understanding language, difficulty relating to people, unusual play with toys or other objects, and repetitive body movements. The CDC has reported that the current prevalence of autism spectrum disorder is approximately 1 in 88 children. (Centers for Disease Control & Prevention, Prevalence of Autism Spectrum Disorders — Autism and Developmental Disabilities Monitoring Network, 14 sites, United States, 2008, 61 Morbidity and Mortality Weekly Report [No. 3], Surveillance summaries [Mar. 30, 2012] [exhibit 8].)
The defendant has presented peer-reviewed studies conducted with appropriate controls that bolster the generally accepted medical finding that autism/PDD is primarily a genetic or environmental disorder. (See Rebecca Muhle et al., The Genetics of Autism, 113 Pediatrics [No. 5] e472 [May 1, 2004]; A. Bailey et al., Autism as a Strongly Genetic Disorder: Evidence From a British Twin Study, 25 Psychological Medicine [No. 1] 63 [Jan. 1995] [which concluded that “(t)he findings indicate that autism is under a high degree of genetic control and suggest the involvement of multiple genetic loci. Obstetric hazards usually appear to be consequences of genetically influenced abnormal development, rather than independent aetiological factors. Few new cases had possible medical aetiologies, refuting claims that recognized disorders are common aetiological influences”] [exhibit 20].)
Catalina Betancur, in a 2011 study entitled Etiological Heterogeneity in Autism Spectrum Disorders: More than 100 Genetic and Genomic Disorders and Still Counting (1380 Brain Research 42 [Mar. 22, 2011]), stated:
“We carried out an exhaustive review of the clinical genetics and research genetics literature in an attempt to collate all genes and recurrent genomic imbalances that have been implicated in the etiology of ASD. We provide data on 103 disease genes and 44 genomic loci reported in subjects with ASD or autistic behavior. These genes and loci have all been causally implicated in intellectual disability, *816 indicating that these two neurodevelopmental disorders share common genetic bases” (exhibit 20).
The defendant’s counsel points to an entry of the genetic report in Dr. Grecco’s obstetrical records of Lauren Melnick, which indicates that there is a family history of autism on both the infant’s mother’s side of the family (two second cousins) and father’s side of the family (two first cousins) (exhibit 9). Plaintiffs’ counsel vigorously opposes that entry as unsubstantiated hearsay. But it was apparently supplied by Lauren Melnick when giving a history to her physician. However, most cases of autism are believed to be caused by errors in human DNA that are random and spontaneous — referred to as “sporadic” autism — rather than inherited. Sporadic autism may account for up to 90% of autism cases. The causative genomic errors are frequently due to “copy number variations” (CNVs). A 2007 published study found that the “strong association of de novo CNVs with [autism spectrum disorders] is consistent with such mutations being a primary cause in most cases rather than merely contributory.” (Jonathan Sebat at al., Strong Association of De Novo Copy Number Mutations with Autism, 316 Science [No. 5,823] 445, 447 [2007] [exhibit 10].)
As to causes outside of genetics, despite significant research into the potential role of pregnancy and birth complications in the origin of autism, the causal nature of these associations remain unknown. (Alexander Kolevzon et al., Prenatal and Perinatal Risk Factors for Autism: A Review and Integration of Findings, 161 Archives of Pediatrics & Adolescent Med [No. 4] 326 [Apr. 2007] [exhibit 11].) Other researchers suggest that underlying and unknown medical conditions, or environmental factors and genes that act during the prenatal period, may lead to both the preterm delivery and subsequent health or development problems. (Dag Moster et al., Long-Term Medical and Social Consequences of Preterm Birth, 359 New England Journal of Medicine [No. 3] 262 [July 17, 2008] [exhibit 13].)
Dr. Rubenstein in his 2012 written report cited studies from 2001 and 2008 to support his theory that Jenny’s premature birth caused ASD. The first article cited by Dr. Rubenstein, Prenatal, Perinatal, and Neonatal Factors in Autism, Pervasive Developmental Disorder-Not Otherwise Specified, and the General Population, did not find a statistically higher incidence of autism in the low birth weight infants in the study compared to the control group. While that study of 74 participants and 28 pre-, peri-, and neonatal risk factors found an increased *817 incidence of hyperbilirubinemia in the Autism/PDD group, the authors were compelled to note in their conclusion that
“the interpretation of these results is difficult, because the specific complications that carried the highest risk of autism represented various forms of pathological processes with no apparent unifying feature. This lack of specificity may indicate that various types of physical damage may underlie some features of autistic symptomatology, but that no single complication or cluster of complications is responsible for the development of autism. Furthermore, this may indirectly support the hypothesis that autism has a genetic cause determining a particular pathologic development that may even cause these complications to occur.” (Juul-Dam, Townsend & Courchesne, Prenatal, Perinatal, and Neonatal Factors in Autism, Pervasive Developmental Disorder-Not Otherwise Specified, and the General Population, 107 Pediatrics [No. 4] e63 at 6 [emphasis added] [exhibit 5].)
The second article Dr. Rubenstein cited, Limperopoulos et al., Positive Screening for Autism in Ex-preterm Infants: Prevalence and Risk Factors (121 Pediatrics [No. 4] 758) (exhibit 6) was a study of 91 survivors of extreme prematurity. The median age in the cohort was 26 weeks gestational age, and 890 grams (1 lb. 15 oz.). By contrast, the infant plaintiff here was in her 34th week of gestational age and weighed 2,381 grams (five pounds, four ounces). The authors of the study cautioned that “[fjinally, our study cohort represents a selected high-risk population of preterm infants and therefore may not be generalizable to healthier preterm populations.” (Id. at 763 [emphasis added].) Furthermore, the authors made no causation claims, but were trying to identify a high-risk population that might benefit from earlier, more intensive interventions.
The plaintiffs’ counsel has added two studies not cited by their expert witness to substantiate their causation theory. In 2010 a study assessed the actual diagnostic prevalence of autism in children born prematurely. (Samantha Johnson et al., Autism Spectrum Disorders in Extremely Preterm Children, 156 J Pediatrics [No. 4] 525 [Apr. 2010] [exhibit 14].) In that study, parents of 219 11 year olds born at extremely low gestational age of less than 26 weeks were interviewed. The prevalence of autism was reported to be 8%. In 2011, another study revealed that there was a fivefold increase in autism in children born *818 prematurely with a low birth weight of less than 2,000 grams. (J. Pinto-Martin et al., Prevalence of Autism Spectrum Disorder in Adolescents Born Weighing <2000 Grams, 128 Pediatrics [No. 5] 883 [Nov. 1, 2011] [exhibit 15].) While the outer limit of that study was 2,000 grams, the cohort of subjects ranged from 500 to 2,000 grams, with a median of 1,250 grams.
In none of these studies is prematurity cited as the “cause” of autism/PDD. Rather, a statistical association has been noted as to “very low birth weight” children born at 26 weeks of gestational age.
In arguing for a cause for his client’s autism/PDD, plaintiffs’ counsel has generalized that a premature birth and a low birth weight may be contributing factors to delayed development in a newborn. However, it is the degree of prematurity and the actual weight that are critical. The plaintiffs’ counsel is equating the general developmental delays of a slightly premature birth to a diagnosis of autism spectrum disorder with pervasive developmental delay, which is a quantum leap of causation. General causation must first be established by medical researchers and scientists who have considered prematurity and low birth weight as a generally acceptable cause of autism/PDD. But the medical researchers have only shown a statistical association and have cautioned about establishing it as a cause of autism/PDD. Moreover, to demonstrate specific causation underlying facts must fit the facts of this case. Here they do not. Indeed, plaintiffs’ expert report only opines that prematurity is statistically associated with autism/PDD. And he comments that while Jenny had a low birth weight, she did not have a very low birth weight as did the subjects in the studies he referenced.
There is absolutely no medical or scientific rationale to equate a child born at 26 weeks with a child born in the 34th week weighing five pounds, four ounces. In the eight weeks between the 26th week of gestation and the 34th week, the development of a fetus in the womb is dramatic. Therefore, plaintiffs’ expert witness’s opinion is too diverse and incongruous with the facts of this case to be medically reliable, relevant or helpful to the jury. But more importantly, the plaintiffs’ expert has testified that there is no specific mechanism for a cause of the autism spectrum disorder, and he agreed that no one knows what causes autism (tr at 50).
Lastly, the plaintiffs’ expert agreed with the leaders of the medical community studying autism on a regular basis that the causes appear to be genetic or environmental. To allow the *819 plaintiffs’ expert to testify that Jenny Fay Kusner’s diagnosis of autism/PDD was caused by her preterm delivery at 34.2 weeks with a birth weight of five pounds, four ounces is not based on generally accepted science and would be pure speculation. Here there is too great an analytical gap to extrapolate the statistical associations of the plaintiffs’ cited studies as to very low birth weights at 26 weeks of gestational age to the actual facts of this case. The medical community has not established causes other than genetics or environmental factors for autism/PDD. It is not the role of a jury of laypersons to find additional causes of autism/PDD where the medical researchers have not found such causes.
Accordingly, it is hereby ordered that the plaintiffs’ expert, Dr. Allan Rubenstein, is precluded from testifying that Jenny Fay Kusner’s autism/pervasive developmental disorder or global development delay was caused by her premature birth and low birth weight; and it is further ordered that the plaintiffs’ causes of action for injury to Lauren Melnick and Jenny Fay Kusner due to her autism/PDD are dismissed with prejudice without costs and disbursements.